**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| MARIBEL ORTIZ, | : | CIVIL CASE NO. |
| Plaintiff, | : | 3:24-CV-00350 (JCH) |
| | : | |
| v. | : | |
| | : | |
| UNIVERSITY OF CONNECTICUT, | : | NOVEMBER 22, 2024 |
| Defendant. | : | |

**RULING ON MOTION TO DISMISS (DOC. NO. 18)**

## I.    INTRODUCTION

Plaintiff Maribel Ortiz ("Ms. Ortiz") brings this action under Title VII of the Civil

Rights Act of 1964 ("Title VII"), section 2000e et seq. of title 42 of the U.S. Code; the

Connecticut Fair Employment Practices Act ("CFEPA"), section 46a-60 et seq. of the

Connecticut General Statutes; and the Age Discrimination in Employment Act of 1967

("ADEA"), section 621 et seq. of title 29 of the U.S. Code against her employer, the

University of Connecticut ("UConn").  See Complaint ("Compl.") (Doc. No. 1-2).

Before the court is the defendant's Motion to Dismiss, see Motion to Dismiss

("Mot.") (Doc. No. 18); Memorandum of Law in Support of Motion to Dismiss ("Mem.")

(Doc. No. 18-1); Reply in Support of Motion to Dismiss ("Reply") (Doc. No. 23), which

the plaintiff opposes, see Memorandum of Law in Opposition to Motion to Dismiss

("Opp.") (Doc. No. 19).

For the reasons discussed below, the defendant's Motion to Dismiss is granted in

part and denied in part.

1

## II.    BACKGROUND

### A.    Alleged Facts

This action is commenced by Ms. Ortiz.  See Compl.  The court provides a summary of allegations relevant to this Ruling with reference to other background information.  As it must, the court assumes the well-pleaded factual allegations in the plaintiff's Complaint are true for the purposes of deciding the defendant's Motion to Dismiss.

Ms. Ortiz is a 58-year-old Puerto Rican woman.  Id. at ¶ 8.  She has been an employee of the State for over 34 years.  Id. at ¶ 9.  For 31 of those 34 years, she has been employed as an Administrative Program Support 4 ("APS4") at UConn.  Id.  All other APS4 personnel within Ms. Ortiz's department are white.  Id. at ¶ 10.

In all her time as an APS4, Ms. Ortiz's job performance has been "satisfactory or above", and she has had no disciplinary history, aside from receiving a written warning, as discussed infra.  Id. at ¶¶ 11, 16.

Ms. Ortiz's salary grade designation is 1P4.  Id. at ¶ 9.  She does not receive additional compensation for the notary, translation, and interpretation services she provides to UConn.  Id. at ¶ 12.

Starting in 2020, Ms. Ortiz's department worked remotely due to the COVID-19 pandemic.  Id. at ¶ 14.  UConn notified the department that employees would need to report to work in person beginning August 16, 2021.  Id.  Ms. Ortiz requested additional time to return to in-person work in order to make arrangements for her disabled child, in light of the difficulty finding a facility or individual to provide care during the pandemic. Id. at ¶ 15.  Ms. Ortiz ended up requiring assistance from her union for her request.  Id. at ¶ 16.  Sometime after, Ms. Ortiz was issued an unwarranted written warning for

having her head down and reading documents during a virtual team meeting despite UConn's policy of issuing a verbal warning prior to a written one.  Id. at ¶¶ 16–17.  Ms. Ortiz's union disputed this written warning in another grievance filing.  Id. at ¶ 17.

In April 2022, eight weeks after issuance of the written warning, Ms. Ortiz learned that a co-worker, B.P., was retiring.  Id. at ¶ 19.  A written warning would hinder, if not preclude, Ms. Ortiz from transferring to another position at UConn.  Id. at ¶ 18.  Upon information and belief, Ms. Ortiz was issued the written warning to prevent her from requesting to transfer to B.P.'s position.  Id. at ¶ 19.

Upon checking whether B.P.'s position was still classified as an APS4 position and falling within the 1P4 salary grade, Ms. Ortiz learned that B.P., who is white and had been employed at UConn for 16 years, was compensated at a significantly higher salary than she was.  Id. at ¶ 20.  Upon further investigation, Ms. Ortiz also learned that, in the fiscal year 2022, all white APS4 employees in the same department as Ms. Ortiz had a higher salary than she did.  Id. at ¶ 21.  Even the least tenured ASP4 employee with three years tenure was compensated at a higher salary than Ms. Ortiz was.  Id. at ¶ 23.  Additionally, it came to her attention that a white APS3 employee with a lower salary grade designation was compensated at a higher salary than she was.  Id. at ¶ 22.

Ms. Ortiz reported this discrepancy to UConn's Office of Integrity.  Id. at ¶ 24.  The Office of Integrity responded to the report, stating that Ms. Ortiz's position did not warrant the same level of pay because Ms. Ortiz's duties excluded accounting of employees who received benefits.  Id.  However, the ASP4 job description is the same for all APS4 employees.  Id. at ¶ 25.  All APS4 "job duties require substantially equal skill, effort, responsibility," and all APS4 "functions are performed under similar working

conditions". <u>Id.</u>  The only exception is that Ms. Ortiz is responsible for 5,000 accounts whereas some of her peers manage 600.  <u>Id.</u>

In 2023, UConn increased the salary of all APS4 employees.  <u>Id.</u> at ¶ 28. However, despite Ms. Ortiz's report, her pay was still below her peers' salaries.  <u>Id.</u> at ¶ 28.  Furthermore, throughout her time at UConn, Ms. Ortiz was "not [ ] assigned additional assignments or promotional opportunities" that were assigned to her white co-workers.  <u>Id.</u> at ¶ 26.  These assignments or opportunities are not available via application or bid; rather, they are personally assigned by management.  <u>Id.</u> at ¶ 27.

In May and June 2023, UConn hired two new ASP4 employees.  <u>Id.</u> at ¶ 29. Both hires were white and younger than Ms. Ortiz.  <u>Id.</u> at ¶ 29.  Despite Ms. Ortiz's seniority and experience of 31 years, both new hires were compensated at a higher annual salary than Ms. Ortiz's salary.  <u>Id.</u> at ¶ 29.

B.     Procedural History

Ms. Ortiz commenced this action in the Connecticut Superior Court on February 9, 2024.   <u>See</u> Compl. (Doc. No. 1-2).  In her Complaint, Ms. Ortiz asserts five counts, alleging race discrimination in violation of Title VII and CFEPA and age discrimination in violation of the ADEA.  <u>See id.</u>

UConn removed the action to federal court pursuant to sections 1441 and 1446 of title 28 of the U.S. Code.  <u>See</u> Notice of Removal at 1-2.

UConn moved to dismiss all counts on various grounds.  <u>See</u> Mot.; Mem.  Ms. Ortiz filed her opposition to the defendant's Motion to Dismiss Counts One through Four and expressly abandoned her ADEA claim in Count Five and her claim for punitive damages.  <u>See</u> Opp.  Two weeks later, UConn filed its response.  <u>See</u> Reply.  The court now considers UConn's Motion to Dismiss.  <u>See</u> Mot.

4

### III.    STANDARDS OF REVIEW

#### A.    Rule 12(b)(1)

Under Federal Rule of Civil Procedure 12(b)(1) ("Rule 12(b)(1)"), "[a] case is properly dismissed for lack of subject matter jurisdiction . . . when the district court lacks the statutory or constitutional power to adjudicate it." Makarova v. United States, 201 F.3d 110, 113 (2d Cir. 2000). The plaintiff bears the burden of proving the existence of subject matter jurisdiction. Makarova, 201 F.3d at 113. In determining whether the plaintiff has met this burden, the court must accept as true all factual allegations in a complaint and draw all reasonable inferences in favor of the plaintiff. See Carter v. HealthPort Techs., LLC, 822 F.3d 47, 57 (2d Cir. 2016); Aurecchione v. Schoolman Transp. Sys., Inc., 426 F.3d 635, 638 (2d Cir. 2005). The court may also rely on evidence outside a complaint in deciding a Rule 12(b)(1) motion. Makarova, 201 F.3d at 113.

#### B.    Rule 12(b)(6)

To withstand a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) ("Rule 12(b)(6)"), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp v. Twombly, 550 U.S. 544, 570 (2007)). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." Id. Reviewing a motion to dismiss under Rule 12(b)(6), the court liberally construes the claims, accepts the factual allegations in a Complaint as true, and draws all reasonable inferences in the nonmovant's favor. See La Liberte v. Reid, 966 F.3d 79, 85 (2d Cir. 2020). However,

the court does not credit legal conclusions or "[t]hreadbare recitals of the elements of a cause of action." Iqbal, 556 U.S. at 678.

## IV.    DISCUSSION

In Counts One through Four, Ms. Ortiz asserts race discrimination claims under Title VII and CFEPA against UConn.  See Compl. at ¶¶ 30–50.  In Count Five, she alleges UConn discriminated against her on the basis of age in violation of the ADEA. See id. at ¶¶ 50–60.

UConn moves to dismiss on several grounds.  First, UConn argues that the court lacks jurisdiction over the CFEPA claims (Counts Two and Four) on the ground that Ms. Ortiz failed to exhaust her administrative remedies.  See Mem. at  7–9.  UConn further argues that the ADEA claim (Count Five) is barred by Connecticut's sovereign immunity.  See id. at 9–11.  UConn also seeks dismissal of the Title VII and ADEA claims on the ground that Ms. Ortiz failed to state plausible race and age discrimination claims.  See id. at 11–16.  Further, it argues that the Title VII claim in Count Three should be dismissed as duplicative of the Title VII claim in Count One.  See id. at 16–17.  Lastly, UConn contends that Ms. Ortiz's claims should be dismissed insofar as they seek punitive damages.  See id. at 17–18.

Ms. Ortiz's explicitly abandons her ADEA claim in Count Five and her claims for punitive damages.  See Opp. at 15.  As such, the court grants the defendant's Motion to Dismiss as to that abandoned claim and remedy.  The court limits its discussion to the remaining arguments.

### A.    CFEPA: Exhaustion (Counts Two & Four)

In its Motion to Dismiss, UConn argues that Ms. Ortiz's claims under CFEPA, Counts Two and Four, should be dismissed for lack of subject matter jurisdiction

because Ms. Ortiz did not exhaust her administrative remedies.  See Mem. at 7–9.

Specifically, it claims that, because Ms. Ortiz failed to obtain a release of jurisdiction

from the CHRO, this court lacks jurisdiction over her CFEPA claims.  See id.

Title VII and CFEPA both require that claimants exhaust administrative remedies

before pursuing judicial action.  Hardaway v. Hartford Pub. Works Dep't, 879 F.3d 486,

489 (2d Cir. 2018) (Title VII); Sullivan v. Bd. of Police Comm'rs of City of Waterbury, 196

Conn. 208, 216 (1985) (CFEPA).  However, while administrative exhaustion is non-

jurisdictional for Title VII claims, failure to exhaust administrative remedies deprives the

court of jurisdiction over CFEPA claims.  McVay v. Stefanou, No. 3:20-CV-00764

(CSH), 2021 WL 3260852, at *8 & *8 n.5 (D. Conn. July 30, 2021).  Only in exceptional

circumstances will a plaintiff be allowed to "bypass administrative remedies in favor of

direct judicial action" for her CFEPA claims.  See Sullivan, 196 Conn. at 216.

In her Complaint, Ms. Ortiz alleges that she filed her Charge with the EEOC,

which was dual-filed with the CHRO pursuant to the Worksharing Agreement between

the EEOC and the CHRO.  See Compl. at ¶ 3.  The EEOC provided Ms. Ortiz with a

right-to-sue letter, but the CHRO refused to release jurisdiction, claiming that a dual-

filed complaint does not constitute a filing with the CHRO.  See id. at ¶¶ 4–5.  Ms. Ortiz

argues that the CHRO is incorrect because, according to the Worksharing Agreement

and federal regulations, her claim was timely filed with the CHRO.  See id. at ¶ 6.  As

such, according to Ms. Ortiz, she administratively exhausted her CFEPA claims.  See

id.  Alternatively, Ms. Ortiz contends that exceptional circumstances warrant waiving the

exhaustion requirement.  See id. at ¶ 7.  This is because exhaustion would be futile

after the CHRO violated its own policies by refusing to recognize the claim Ms. Ortiz purportedly filed with the CHRO.  See id.

CFEPA provides:

> Any person who has filed a complaint with the commission in accordance with section 46a-82 and who has obtained a release of jurisdiction in accordance with section 46a-83a or 46a-101, may bring an action in the superior court . . . . [1]

See Conn. Gen. Stat. § 46a-100 (emphasis added); see also, id. § 46a-101(a) ("No action may be brought in accordance with section 46a-100 unless the complainant has received a release from the commission in accordance with the provisions of this section.").  It is uncontroverted that Ms. Ortiz has failed to secure an administrative release letter from the CHRO.  Therefore, even assuming that a dual filed Charge constitutes a filing with the CHRO as Ms. Ortiz alleges, see Compl. at ¶ 3, the court lacks jurisdiction unless Ms. Ortiz's case constitutes an exceptional circumstance.

---

[1] Section 46a-83a of the Connecticut General Statute provides:

> If a complaint is dismissed for failure to accept full relief pursuant to subsection (m) of section 46a-83, and the complainant does not request reconsideration of such dismissal as provided in subsection (h) of section 46a-83, the executive director shall issue a release of jurisdiction and the complainant may, within ninety days of receipt of the release from the commission, bring an action in accordance with sections 46a-100 and 46a-102 to 46a-104, inclusive.

See Conn. Gen. Stat. § 46a-83a.  Section 46a-101 provides, in relevant part:

> The complainant and the respondent, by themselves or their attorneys, may jointly request that the complainant receive a release from the commission at any time from the date of filing the complaint.  The complainant or the complainant's attorney may request a release from the commission if the complaint is still pending after the expiration of one hundred eighty days from the date of its filing or after a case assessment review in accordance with subsection (c) of section 46a-83, whichever is earlier.  The executive director or the executive director's designee shall conduct an expedited case assessment review in accordance with subsection (c) of section 46a-83 if the commission receives a request for a release of jurisdiction from the complainant prior to one hundred eighty days from the date a complaint is filed.

See id. § 46a-101(b).

The court will first address the underlying argument that the CHRO violated its policies before turning to the issue of whether the circumstances in the instant case warrant an exception or waiver to the administrative exhaustion doctrine.

### 1.    CHRO Regulations & Policies

As noted supra, there are two prerequisites for direct judicial action: a timely filing of a complaint with the CHRO and a release of jurisdiction from the CHRO.   See Conn. Gen. Stat. § 46a-100 ("any person who has filed a complaint with the [CHRO] in accordance with section 46a-82 and who has obtained a release of jurisdiction in accordance with section 46a-83a or 46a-101, may bring an action in the superior court . . . ."). CFEPA requires that the CHRO release jurisdiction under a number of different circumstances.  In relevant part, the CHRO must release its jurisdiction if the complainant requests release after the expiration of 180 days from the date of filing of the complaint.  See Conn. Gen. Stat. § 46a-101.

CFEPA provides that "[a]ny person claiming to be aggrieved by an alleged discriminatory practice . . . may, by himself or herself or by such person's attorney, file with the [CHRO] a complaint in writing under oath" within 180 days after the purported discriminatory act.  See Conn. Gen. § 46a-82(a), (f).  The complaint must "state the name and address of the person alleged to have committed the discriminatory practice, provide a short and plain statement of the allegations upon which the claim is based and contain such other information as may be required by the commission.

The regulations provide slightly more detail.  See Williams v. General Nutrition Ctrs., Inc., 326 Conn. 651, 657-58 (2017) ("[R]egulations have the same force and effect as statutes . . . .").  The "complaint may be filed by delivery in person, by United States mail or by document or other delivery service, to an office of the commission."

See Conn. Agencies Regs. § 46a-54-36a(a).  The date of filing shall be the date of filing the

complaint is received by the commission in one of its offices.  Id. § 46a-54-36a(b).

The regulations further provide that "[t]he complainant is responsible for the timely filing

of a complaint in accordance with the Connecticut General Statutes and section 46a-54-

34a of the Regulations of Connecticut State Agencies, provided that once the

commission receives a complaint, the commission's failure to promptly record the

complaint, shall not affect the validity of the complaint or the commission's authority to

process the complaint."  See id. § 46a-54-36a(c).

In the instant case, the parties dispute whether the dual-filed complaint

constitutes a filing with the CHRO pursuant to the CHRO's policies, namely the

Worksharing Agreement.  Because more than a year has passed since the EEOC

forwarded Ms. Ortiz's charge, see Pl.'s Ex. 1, January 2024 Email from EEOC (Doc. No.

19-1) (confirming charge was sent for dual-filing on July 25, 2022), if Ms. Ortiz's dual-

filed complaint is a filing with the CHRO, the CHRO violated the regulation mandating

that it release its jurisdiction upon Ms. Ortiz's request after the expiration of 180 days

since the filing of the complaint.

The Worksharing Agreement refers to a "'work-sharing' scheme" created

pursuant to Title VII under which the EEOC and CHRO have historically worked

together.  See Connecticut Jud. Branch v. Gilbert, 343 Conn. 90, 111 & 111 n. 15

(2022); see also, 42 U.S.C. §§ 2000e-5(d), 2000e-8(b).  The court takes judicial notice

of the model Worksharing Agreement used between the EEOC and Fair Employment

Practice Agencies, such as the CHRO.  See U.S. EEOC, FY 2022 EEOC/FEPA Model

Worksharing Agreement, available at https://www.eeoc.gov/fy-2022-eeocfepa-model-

worksharing-agreement (last visited November 21, 2024) (hereinafter, "Worksharing

Agreement").[2]

      CFEPA provides the CHRO with the statutory authority to enter into the

Worksharing Agreement.  <u>See</u> Conn. Gen. Stat. § 46a-54 (providing that the

commission has powers and duties to, <u>inter alia</u>, "adopt, publish amend and rescind

regulations consistent with and to effectuate the provisions of this chapter" and "enter

into contracts for and accept grants of private or federal funds").  In <u>Paris-Purtle v.

State</u>, the Connecticut Superior Court rejected the same argument that Ms. Ortiz raises

here, that is, that a dual filed complaint satisfies the CFEPA filing requirement.  <u>See

Paris-Purtle v. State</u>, No. X10UWYCV146025212, 2015 WL 1500798, at *6–*8 (Conn.

Super. Ct. Mar. 11, 2015).  Although acknowledging that <u>Envirotest Systems Corp. v.

Comm'r of Motor Vehicles</u>, 293 Conn. 382 (2009) and <u>State v. Lombardo Bros.</u>, 307

Conn. 412 (2014) were not directly on point, the <u>Paris-Purtle</u> court nonetheless relied on

these two cases to essentially hold that the Commissioner does not have the statutory

authority to accept filings submitted to the CHRO by the EEOC on behalf of a

complainant.  <u>See</u> 2015 WL 1500798, at *7.  In particular, the court determined that the

Commissioner cannot "expand the mechanism by which the state waives its sovereign

immunity" by way of the Worksharing Agreement.  <u>See</u> <u>id.</u>

      However, <u>Paris-Purtle</u> misapprehends <u>Envirotest</u> and <u>Lombardo Bros.</u>

<u>Envirotest</u> held that the statute authorizing the commissioner of motor vehicles does

have the authority to waive the state's sovereign immunity by way of his power to enter

---

[2] The model Worksharing Agreement referenced by the court does not significantly differ from the 2012 Workshare Agreement cited in <u>Connecticut Judicial Branch v. Gilbert</u>, 343 Conn. 90, 111 & 111 n. 15 (2022).

into contracts.  See 293 Conn. at 395.  Indeed, in Lombardo Bros., the Court wrote:

"Our holding in Envirotest is consistent with a long line of cases recognizing that

government officials cannot waive sovereign immunity, contractually or otherwise, in the

absence of explicit legislation authorizing them to do so."  See Lombardo Bros., 307

Conn. at 462.  In Lombardo Bros., the Connecticut Supreme Court held that neither the

state's limited waiver of sovereign immunity in section 4-61[3] nor the commissioner of

transportation's power to enter into contracts does not abrogate nullus tempus—the

state's immunity from statutes of limitations when the state initiates claims.  See 307

Conn. at 453–59.

Neither Envirotest nor Lombardo Bros. have any direct bearing on the

Worksharing Agreement at issue here.  Indeed, the circumstances at hand differ from

those at issue in Envirotest and Lombardo Bros.  The Worksharing Agreement does not

attempt to abrogate state sovereign immunity.  The legislature expressly waived its

sovereign immunity with respect to CFEPA claims when it promulgated section 46a-100

of the Connecticut General Statutes.  See Conn. Gen. Stat. § 46a-100; Lyons v. Jones,

291 Conn. 384 (2009).  Further, the court cannot accept Paris-Purtle's conclusion that

the Worksharing Agreement is a mechanism for expanding the state's waiver of

immunity.  In this court's view, a regulation, policy, or other scheme that permits another

method for filing with the CHRO does not expand the state's waiver of sovereign

immunity, especially where the state has expressly waived immunity for the types of

---

[3] "By its express terms, [section] 4–61 'grants the right to sue the state . . . to contractors who have entered into a contract with the state and who have a dispute under such contract.'"  Lombardo Bros., 307 Conn. at 452 (quoting Federal Deposit Ins. Corp. v. Peabody, N.E., Inc., 239 Conn. 93, 104 (1996)).

claims subject to the filing requirement.  An interpretation to the contrary would imply that, wherever the state has waived sovereign immunity, the Commissioner has no authority to promulgate regulations or policies simply because the state could be subject to suit.

Indeed, Lombardo Bros. supports this court's viewpoint.  Lombardo Bros. reiterates that, once the state legislature has waived its sovereign immunity, "procedural statutes and rules of court [must] be applied to the state, just as they would be applied to any other litigant."  See Lombardo Bros., 307 Conn. at 456 (quoting Lacasse v. Burns, 214 Conn. 464, 468 (1990)).  In other words, "once involved in an action, the state enjoys the same status as any other litigant."  See id. (quoting Lacasse, 214 Conn. at 469).  Lombardo Bros. merely clarifies that its "holding [in Lacasse v. Burns] d[oes] not apply to procedural statutes or rules of court that deprive the state of immunity beyond the scope of the explicit waiver giving rise to the action."  See id. at 457 (citing Lacasse, 214 Conn. at 469).  That is, "[s]tatutory limitation periods are not procedural in the sense contemplated by Lacasse because their application would deprive the state of immunity" provided by nullus tempus.  See id.  Therefore, the question of whether the state has waived its sovereign immunity is separate from the question of whether the CHRO has the power to enter into an agreement that may implicate the regulations pertaining to the process for filing complaints with that agency.

Thus, the court turns to whether the Worksharing Agreement provides support for or forecloses Ms. Ortiz's argument that a dual-filed complaint constitutes a filing with the CHRO.  Paragraph A of Section II of the model Worksharing Agreement, titled, "Filing of Charges of Discrimination," provides:

> In order to facilitate the assertion of employment rights, the EEOC and the [CHRO] each designate the other as its agent for the purpose of receiving and drafting charges, including those that are not jurisdictional with the agency that initially receives the charges. The EEOC's receipt of charges on the [CHRO]'s behalf will automatically initiate the proceedings of both the EEOC and the [CHRO] for the purposes of Section 706(c) and (e)(1) of Title VII. This delegation of authority to receive charges does not include the right of one Agency to determine the jurisdiction of the other Agency over a charge. Charges can be transferred from one agency to another in accordance with the terms of this agreement or by other mutual agreement.

See Worksharing Agreement, § II, ¶ A.  This portion of the Agreement makes clear that, for the purpose of receiving charges, the agencies serve as each other's agent, even as to charges that arise under one jurisdiction (here, state) but are filed with the agency of the other jurisdiction (here, federal).

The second sentence clearly indicates that, when the EEOC receives charges on the CHRO's behalf, proceedings of both agencies will initiate, albeit the last phrase of sentence two refers only to Title VII.  See id. at § III, ¶ A.  Initiation of proceedings by both agencies to process Title VII charges does not necessarily impact the ability of one agency to receive non-Title VII charges on the other's behalf.[4]  Indeed, limiting the power of each agency to receive and draft charges on behalf of the other agency only to Title VII claims would render the second clause of the first sentence—providing for receipt on the other agency's behalf even for claims "that are not jurisdictional with the agency that initially receives the charges"—meaningless.  See id. § II, ¶ A.

While the model Worksharing Agreement does not define "dual-filing", the second sentence of paragraph A of Section II, discussed above, provides that the

---

[4] It appears that the agencies merely meant to reiterate that Title VII claims may result in two administrative proceedings.  This is further affirmed in Paragraph A of Section III, which states that, the EEOC receives the charge initially, the CHRO waives its right of exclusive jurisdiction over the Title VII claims.  See Worksharing Agreement, § III, ¶ A.

EEOC's receipt will initiate proceedings of Title VII claims in both the federal and state

agencies.  See id.  Further, the first sentence expressly states that the EECO is the

CHRO's agent for "receiving charges."  Id.  This clearly supports the court's view that,

upon receipt, the agencies automatically coordinate forwarding or sharing charges.

This interpretation is further supported by information offered to the public by the EEOC.

On a webpage instructing readers how to file a charge of employment discrimination,

the EEOC explains:

> Many states and localities have agencies that enforce laws prohibiting
> employment discrimination. EEOC refers to these agencies as Fair
> Employment Practices Agencies (FEPAs). EEOC and some FEPAs have
> worksharing agreements in place to prevent the duplication of effort in
> charge processing.  According to these agreements, if you file a charge with
> either EEOC or a FEPA, the charge also will be automatically filed with the
> other agency. This process, which is defined as dual filing, helps to protect
> charging party rights under both federal and state or local law. If you file a
> charge at a state or local agency, you can let them know if you also want
> your charge filed with the EEOC.

See U.S. EEOC, How to File a Charge of Employment Discrimination, available at

https://www.eeoc.gov/how-file-charge-employment-discrimination (last visited

November 21, 2024) (emphasis added).  On yet another webpage, the EEOC provides,

in relevant part:

> You can file your charge with either the EEOC or with a Fair Employment
> Practices Agency.  When an individual initially files with a FEPA that has a
> worksharing agreement with the EEOC, and the allegation is covered by a
> law enforced by the EEOC, the FEPA will dual file the charge with EEOC
> (meaning EEOC will receive a copy of the charge), but will usually retain the
> charge for processing.  If the charge is initially filed with EEOC and the
> charge is also covered by state or local law, EEOC dual files the charge
> with the state or local FEPA (meaning the FEPA will receive a copy of the
> charge), but ordinarily retains the charge for processing.

See EEOC, Fair Employment Practices Agencies (FEPAs) and Dual filing, available at

https://www.eeoc.gov/fair-employment-practices-agencies-fepas-and-dual-filing (last

visited November 21, 2024).  Thus, according to the EEOC, pursuant to its worksharing agreements, once it receives a charge also covered by state law, it will dual-file, i.e., automatically file, the charge with the appropriate state agency.[5]

Assuming, without deciding, that a version of the model Worksharing Agreement is in effect between the EEOC and CHRO, it would defy both common sense and the purpose of the Agreement for the CHRO to claim that a dual-filed complaint does not constitute a filing with the CHRO.  As discussed, the model Worksharing Agreement supports the conclusion that the EEOC's receipt of a Title VII charge will initiate proceedings at the EEOC and the CHRO.  Although the initiation proceedings at both agencies upon receipt of the complaint by the EEOC only applies to a Title VII charge, the CHRO should receive a copy of the entire charge.  It is illogical for this scheme to have intended for the CHRO to initiate proceedings to the extent the charge is covered by Title VII but ignore the charge insofar as it is covered by CFEPA.  Moreover, to require a plaintiff, who filed a charge with the EEOC alleging federal and state law violations, to file a separate charge with the CHRO for the alleged state violations would frustrate the stated purpose of the Agreement, which is to "provide individuals with an efficient procedure for obtaining redress for their grievances under the appropriate Connecticut State and Federal laws."  See Worksharing Agreement, § 1, ¶ B.

In sum, contrary to UConn's contention, the information before the court at this stage of the litigation provides support for Ms. Ortiz's argument that she filed an administrative complaint with the CHRO via the dual filing process and that the CHRO's refusal to provide a release violates its policies.

---

[5] While the EEOC provides some general information on its agreements with state agencies, the CHRO offers no information on its official webpage.

2.      Exception to the Administrative Exhaustion Requirement

Exceptional circumstances that warrant an exception or waiver of the administrative exhaustion requirement include "when the administrative remedy is plainly inadequate . . . [or] the issue presented for adjudication is beyond the competency of the agency to determine."  Sullivan, 196 Conn. at 216–17 (internal citations omitted); see also, Int'l Ass'n of EMTs & Paramedics, Loc. R1-701 v. Bristol Hosp. EMS, LLC, 222 Conn. App. 178, 188 (2023) ("One of the limited exceptions to the exhaustion rule arises when recourse to the administrative remedy would be demonstrably futile or inadequate . . . .").

Based on the record and briefing before it, the court cannot conclusively determine whether the case at bar constitutes an exceptional circumstance such that Ms. Ortiz need not comply with the requirement that she obtain a release from the CHRO before she may bring her state law claims.  It is possible there are additional facts, e.g., those pertaining to the plaintiff's communications with the CHRO, if any, and the basis for the CHRO's position.  For instance, if Ms. Ortiz had the opportunity to appeal the CHRO's determination that her Charge was never filed with the CHRO, then the futility exception might not apply.  Metro. Dist. v. Comm'n on Hum. Rts. & Opportunities, 180 Conn. App. 478, 502 (2018) (holding that agencies are normally afforded the opportunity to correct their own mistakes and that arguments that an agency is unlikely to declare its own conduct improper or that denial is the likeliest outcome are ordinarily insufficient to waive the exhaustion requirement).

Even if administrative exhaustion is not "futile", the instant case may nonetheless constitute an extraordinary circumstance that would permit Ms. Ortiz to bypass administrative remedies.  Although, under Connecticut law, futility and inadequacy are

17

the most commonly invoked exceptions, the Supreme Court has not foreclosed waiver

in other circumstances.

In <u>Sullivan</u>, the Connecticut Supreme Court wrote:

> Read in its entirety, the CFEPA not only defines important rights designed
> to rid the workplace of discrimination, but also vests first-order
> administrative oversight and enforcement of these rights in the CHRO.  It is
> the CHRO that is charged by the act with initial responsibility for the
> investigation and adjudication of claims of employment discrimination.

196 Conn. at 216.  Since <u>Sullivan</u>, the CFEPA no longer requires that the CHRO

investigate and adjudicate claims.  <u>See</u> Conn. Gen. Stat. § 46a-101 (requiring that the

CHRO release jurisdiction if the complainant requests release after the expiration of 180

days of the filing of the complaint); <u>see also</u>, CCHRO, The Complaint Process: How

does the Commission process a discrimination complaint?, available at

https://portal.ct.gov/chro/complaint-process/complaint-process/complaint-processing

(last visited November 21, 2024) ("Complainants are no longer required to have their

cases heard by the Commission.").  In light of the current scheme, the administrative

exhaustion doctrine as applied to CFEPA only requires that a claimant give the agency

the opportunity to attempt to resolve his or her grievance.

Accepting the allegations in the Complaint as true and drawing all reasonable

inferences in plaintiff's favor, the court cannot conclude that Ms. Ortiz sought to bypass

ordinary administrative proceedings.  <u>See</u> <u>Bd. of Educ. of City of New Haven v. Comm'n</u>

<u>on Hum. Rts. & Opportunities</u>, 344 Conn. 603, 622 (2022) (discussing failure to exhaust

as an intentional bypass of an administrative proceeding); <u>Direct Energy Servs., LLC v.</u>

<u>Pub. Utilities Regul. Auth.</u>, 347 Conn. 101, 146 (2023) ("Typically, courts apply the

exhaustion of administrative remedies doctrine when a party has completely bypassed

an available administrative process.").  The court defers final determination of its

18

subject-matter jurisdiction at this stage of the litigation.  See Guadagno v. Wallack Ader Levithan Assocs., 932 F. Supp. 94, 95 (S.D.N.Y. 1996) ("[W]hile the Court may resolve a factual dispute over jurisdiction at the time the motion is filed, it also has discretion to defer final determination of the dispute until the time of trial, Fed. R. Civ. P. 15(d), thus conserving judicial resources." (citing Stadler v. McCulloch, 882 F. Supp. 1524, 1528–29 (E.D. Pa. 1995), aff'd, 82 F.3d 406 (3d Cir. 1996))).

Accordingly, the court denies the Motion to Dismiss for lack of subject matter jurisdiction over the plaintiff's CFEPA claims in Counts Two and Four, without prejudice to filing a renewed motion on a fuller record.

B.    Title VII (Counts One and Three)

3.    Sufficiency of Allegations (Counts One & Three)

"[T]o properly assert a claim of discrimination against an employer under Title VII, a plaintiff must 'allege two elements: (1) the employer discriminated against [her] (2) because of [her] race, color, religion, sex, or national origin.'"  Buon v. Spindler, 65 F.4th 64, 78 (2d Cir. 2023) (quoting Vega v. Hempstead Union Free Sch. Dist., 801 F.3d 72, 85 (2d Cir. 2015)).  At the pleading stage, the plaintiff is not required to establish a prima facie case under the McDonnell Douglas burden-shifting framework.  Id. at 79. "Instead, for a discrimination claim to survive a motion to dismiss, 'absent direct evidence of discrimination, what must be plausibly supported by facts alleged in the complaint is that the plaintiff [(1)] is a member of a protected class, [(2)] was qualified, [(3)] suffered an adverse employment action, and [(4)] has at least minimal support for the proposition that the employer was motivated by discriminatory intent.'"  Id. (quoting Littlejohn v. City of New York, 795 F.3d 297, 311 (2d Cir. 2015)).

Of the four elements to plausibly allege discrimination in the absence of direct evidence, only the fourth is in dispute in the instant case. UConn moves to dismiss the race discrimination claims in Counts One and Three on the ground that Ms. Ortiz's allegations fail to support a plausible inference that UConn intended to discriminate on the basis of race. See Mem. at 11–15. In particular, the defendant posits that Ms. Ortiz "undermines her race discrimination claims by acknowledging that she received a raise in 2023 in line with her colleagues[6] and that her work duties differ from that of her colleagues in the same department." See id. at 11. In her Opposition, Ms. Ortiz counters that she need only allege that the co-workers she seeks to compare herself to were similarly situated, not that they had the same duties as her. See Opp. at 2–5.

The court agrees with the plaintiff. In the Complaint, Ms. Ortiz relies on a theory of disparate treatment to establish discriminatory intent. Ms. Ortiz need not prove that the individuals to whom she compares herself were identical to her in all aspects. See King v. Aramark Servs. Inc., 96 F.4th 546, 563 (2d Cir. 2024) ("[W]e [have] made it clear that this rule does not require a precise identicality between comparators and the plaintiff." (quoting Matusick v. Erie County Water Auth., 757 F.3d 31, 54 (2d Cir. 2014)). Rather, Ms. Ortiz need only plausibly allege that she was similarly situated in all material aspects to her purported comparators. Graham v. Long Island R.R., 230 F.3d 34, 40 (2d Cir. 2000) ("[T]he standard for comparing conduct requires a reasonably close resemblance of the facts and circumstances of plaintiff's and comparator's cases,

---

[6] The court notes that Ms. Ortiz alleges that, while she received a raise in 2023, so did all other ASP4 employees. Compl. at ¶ 28. This raise, therefore, had the effect of "keep[ing] [the] [p]laintiff's pay below that of her peers." Id.

rather than a showing that both cases are identical." (citing Conward v. Cambridge Sch. Comm., 171 F.3d 12, 20 (1st Cir. 1999)).

Ms. Ortiz alleges that she handles accounts for employees without benefits while her co-workers handle accounts for employees with benefits. See Compl. at ¶ 25. However, she also alleges that the ASP4 employees all have substantially similar skills, responsibilities, and duties. See id. While the reason for the discrepancy offered by UConn's Office of Integrity is that the other employees handle accounting for employees with benefits, see id. at ¶ 24, this difference is not fatal to Ms. Ortiz's claims at this stage. As she contends in her Opposition, see Opp. at 4, that co-workers in her department handle payrolls with benefits is a distinction best addressed at trial. See King, 96 F.4th at 563 ("Whether two employees are similarly situated ordinarily presents a question of fact for the jury." (quoting Graham, 230 F.3d at 39)). Ms. Ortiz has alleged sufficient facts from which discriminatory intent on the part of UConn can be plausible inferred.

Accordingly, the court denies the Motion to Dismiss the Title VII claims in Counts One and Three on the ground that Ms. Ortiz failed to plausibly allege discriminatory intent.

### 4. Duplicative Claims

The defendants ask the court to dismiss Count Three as duplicative of Count One pursuant to the court's "general power to administer its docket". See Mem. at 16 (quoting Curtis v. Citibank, N.A., 226 F.3d 133, 138 (2d Cir. 2000)).

The court cannot conclude that the claims are necessarily duplicative. Although they overlap in some ways, Count One seeks relief for disparate treatment regarding job assignments and promotional activities, see Compl. at ¶¶ 32–33, while the other seeks

relief for pay inequity. <u>See</u> <u>id.</u> at ¶¶ 38–46. As such, the court denies UConn's Motion to Dismiss Count Three on the ground that it is duplicative of Count One.

## V.    CONCLUSION

For the reasons stated above, the court grants in part and denies in part the defendant's Motion to Dismiss (Doc. No. 18). The court grants the Motion as to the plaintiff's abandoned claim, Count Five, and the plaintiff's abandoned request for punitive damages. The Motion is otherwise denied and Counts One through Four will proceed.


**SO ORDERED.**

Dated at New Haven, Connecticut this 22nd day of November 2024.


    /s/ Janet C. Hall        
Janet C. Hall
United States District Judge